MT. HOLLY MINING & MANUFACTURING CO. v. CARALEIGH PHOS-
PHATE & FERTILIZER WORKS.

(Circuit Court of Appeals, Fourth Circuit.    February 4, 1896.)

No. 140.

1. CONTRACTS—MEETING OF MINDS.

The M. Co., of Charleston, made a contract with the C. Co., of Raleigh,
for the sale of a quantity of phosphate rock, at a fixed price, deliverable
in certain quantities per month.    The time for delivery was extended,
and, before delivery was completed, the market price of the rock fell,
and negotiations were opened for a settlement and cancellation of the
contract.    One T., an agent of the M. Co., went to Raleigh, and submit-
ted two alternative propositions to the C. Co., both including the giving
of notes by the C. Co. for certain parts of the price of the rock con-
tracted for.    These propositions were declined, and T. returned to Charles-
ton.    On April 1, 1892, he returned to Raleigh, and made a new proposi-
tion, which the C. Co. declined, and proposed to give notes for less
amounts than the M. Co. had required.    T. telegraphed the M. Co., and
received an answer, which did not authorize the acceptance of the offer,
and suggested a modification.    T., however, agreed to settle on the
terms offered, and proposed that a written agreement be drawn up,
and the notes signed.    The C. Co., however, declined, as T. had not
the M. Co.'s copy of the original contract in his possession for cancella-
tion.    T. returned to Charleston.    The M. Co. decided to accept the C.
Co.'s offer, and drew up an agreement and notes accordingly, which
were sent to the C. Co.    The C. Co. added to the notes a reference to
the contract, making them nonnegotiable, and returned them, signed
in this form, to the M. Co.    The M. Co. declined to accept such notes,
and demanded and received back from the C. Co., to which it had been
sent, the original contract.    Held, that there was no meeting of minds
of the parties on April 1st in any new contract annulling the original
one, and that the latter remained in force; that it was error to submit
to the jury a question which did not depend for solution upon the pre-
ponderative weight of testimony or the credibility of witnesses.

2. SAME—QUESTION FOR COURT.

Held, that it was for the court to determine whether a contract could
be inferred from the facts proved granting to the testimony all the weight
and probative force to which it was entitled.

In Error to the Circuit Court of the United States for the Eastern
District of North Carolina.

John W. Hinsdale, for plaintiff in error.

R. O. Burton, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY,
District Judge.

BRAWLEY, District Judge.    The Mt. Holly Mining & Manufac-
turing Company, a corporation in South Carolina, engaged in the min-
ing of phosphate rock, on June 23, 1891, entered into an agreement in
writing with the Caraleigh Phosphate & Fertilizer Works, a corpora-
tion organized in North Carolina to carry on the business of manufac-
turing phosphates, whereby the first-named company sold to the last-
named 3,000 tons of phospate rock at $7.25 a ton, free on board the
cars at the seller's mines in Berkeley county, S. C.; shipments to be-
gin in September or October, 1891, and to continue at the rate of 500
tons per month, until the contract was performed.    Owing to delays
in the completion of the works of the Caraleigh Company, the rock

was not called for as stipulated, and at the request of said company and by mutual consent there was a postponement of the delivery from time to time, so that but 284 tons had been delivered before April 1, 1892.   Meantime the price of phosphate rock had greatly fallen in the market, and about the end of March the Mt. Holly Company sent its bookkeeper, one W. H. Tucker, to Raleigh, to confer with the Caraleigh Company about the outstanding contract of June 23, 1891, and on the evening of March 28th he was invited to a meeting of its board of directors for that purpose, and at that meeting stated that he was authorized to make two propositions for a settlement,—either to extend the time of the delivery of the rock to January 1, 1893, if the Caraleigh Company would give its notes indorsed by the board, or to cancel the contract if said company would pay $1.75 a ton for the undelivered rock; this being something less than the difference between the contract price and the then market price.  A long discussion followed, and the board decided not to accept this proposition, but to make a counter proposition, which, being submitted to Tucker the next morning, was not accepted by him, and on the same day he returned to his home in Charleston.   After informing the president and other officers of his company of the nonsuccess of his mission, he was sent back to Raleigh, with directions to waive so much of his former instructions as required the indorsement of the notes by the board, but to insist upon the payment of $1.75 per ton for a cancellation of the whole contract.   Upon his return to Raleigh he had an interview with the president and some of the directors of the Caraleigh Company on April 1st, and after considerable discussion the president made a proposition for a settlement, and the following telegrams passed between Tucker and his company:

"Raleigh, April 1, 1892.

"Berkeley Phosphate Co., Charleston, S. C.: Caraleigh offer to cancel 1,500 tons, paying one dollar and a half; settle by note, sixty days, interest six per cent., fifteen hundred tons; three notes, payable January, April, June 1st, ninety-three.   Best can do.   Answer promptly.     William H. Tucker."

To this telegram, the following reply was received:

"Charleston, S. C., April 1, 1892.

"William H. Tucker: Close.  Presume notes indorsed by board.  Try to get notes payable within present year.  President out of city.

"Berkeley Phosphate Co."

The Berkeley Company and the Mt. Holly Company are substantially the same corporation, and the reply of the Berkeley Company was sent by its secretary, the president being absent.   Upon the receipt of this telegram, which, as will be seen, did not in terms authorize the acceptance of the proposition as made, Tucker, after some further discussion, agreed to settle, and proposed that a written agreement be drawn up, and notes executed in accordance therewith, and offered to cancel the agreement of June 23, 1891; but as he was not in possession of the agreement held by the Mt. Holly Company, the president of the Caraleigh Company would not accept the cancellation of his copy, and so the agreement was not then consummated. Tucker returned to Charleston, and, after acquainting his principals with the terms of settlement upon which he had agreed, and urging

the acceptance thereof, a contract was drawn up in accordance therewith; a statement of the account was made up, and notes prepared and forwarded by mail to the Caraleigh Company; also the original contract. Three notes, similar in terms, of one of which the following is a copy, were sent on April 4th:

"$3,044.11.                                    Charleston, S. C., April 1, 1892.

"On November 1 after date we promise to pay to the order of the Mt. Holly Mining and Manufacturing Company three thousand and forty-four and 11-100 dollars at the People's National Bank, Charleston, S. C. Value received.
"Due November 1-4, 1892."

The plaintiff likewise inclosed the old contract of June 23, 1891, seller's copy, to be canceled when and after the proposed new contract should be duly accepted in writing, and the notes should be executed by the defendant. The defendant, on April 7th, wrote to the plaintiff the following letter:

"Raleigh, N. C., April 7, 1892.

"Mt. Holly Mining and Manufacturing Co., Charleston S. C.—Dear Sir: Your favor to hand yesterday, with notes, new contract, etc. We tried to secure a conference with our attorney to-day, but he was so occupied with a business engagement that he would not confer to-day, but a conference has been set with him for ten o'clock in the morning. The results shall be promptly written you. We deem it not amiss to say in advance of the conference that he advised us in a brief conversation on the street to-day that he thought we would be guilty of business imprudence to give negotiable notes for rock undelivered. We said this much to Mr. Tucker. However, we will write you again tomorrow.                                    Yours, truly."

And on April 9th defendant wrote the following letter:

"Raleigh, N. C., April 9, 1892.

"Mt. Holly Mining and Manufacturing Co., Charleston, S. C.—Dear Sir: We beg leave to return herewith the five notes and new contract duly signed. The old contract we will destroy. Under the advice of our attorney, we have added to the three notes given for undelivered material the following: 'As per contract hereto attached and made a part hereof.' We feel sure you will appreciate that, while we have no idea that we should be sufferers in any way should this have been left off, still that is a piece of business prudence and precaution that it is proper for us to take under the advice cited, and not to incur any liability for criticism either at the hands of our directors or stockholders.

"Very truly yours,          Caraleigh Phosphate and Fertilizer Works.
"Per F. B. Dancy, Secretary, Treasurer and General Manager."

Immediately upon the receipt of this letter with its inclosures the plaintiff sent the following telegram:

"Charleston, April 11th, 1892.

"J. J. Thomas, President Caraleigh Phosphate & Fertilizer Works, Raleigh, N. C.: Letter received. Notes unsatisfactory. We notify you not to destroy contract. Tucker leaves to-night for Raleigh.
"[Signed]                          Mt. Holly Mining and Manufacturing Co."

Tucker returned to Raleigh, and the minutes of the regular monthly meeting of the defendant company, held on April 12th, contains the following:

"Subject brought up was the question of the settlement of the company's contract for phosphate rock with the Mt. Holly Mining and Manufacturing Co. Mr. Smith moved that the president, secretary and treasurer and the company's attorney be directed to confer with Mr. Tucker, the representative of the Mt. Holly Co., now present in the city, and offer him $1.50 per ton to cancel the entire balance, 2,715 and 1500/2240 tons of rock; failing in ac-

complishing which to use their discretion in effecting the best settlement their judgment might dictate."

No result followed this third effort at adjustment. Tucker demanded and received the original contract, which had been inclosed in the letter of April 4th, from the Mt. Holly Company to the Caraleigh Company, and subsequently he returned to the president of the Caraleigh Company the notes inclosed in his letter of April 9th. This suit is upon the original contract of June 23, 1891, and the defense is that said contract was annulled and superseded by a new contract made on April 1, 1892.

If the negotiations of that day had terminated as proposed by Tucker, and notes in the form of those tendered on April 9th had been accepted by him, and cancellation written upon the duplicate copy contract held by the defendant company, a very nice question would have arisen as to the nature of Tucker's agency, and his power to bind the plaintiff company by accepting notes of this character. There is a preponderance of testimony that at the meeting of the directors on the 28th of March, attended by Tucker, a most decided opinion was expressed by some of the directors that the company should not give negotiable notes, and it is equally clear that these expressions of opinion made little impression upon him, and were not communicated at all to his principals; nor is it very surprising that such should be the case. His instructions were to compromise by accepting $1.75 a ton in satisfaction of the contract, or to take notes payable by the 1st of January following, indorsed by the individual members of the board. The form of the notes had not been the subject of any specific instruction, and, as the board determined not to accept the terms which he was directed to offer,—that is, not to give any notes at all,—and as he returned home without having effected any settlement, the conversations at that meeting have no illuminative effect upon the negotiations which subsequently followed; and these will now be considered, for it is at the meeting on the 1st of April that the new contract was made, if at all. After his return home, and report to his principals, Tucker was sent back, with instructions similar in all respects to the first, save that he was authorized to waive the demand for the individual indorsement; that is, he was authorized to extend the time for the delivery of the rock to January 1, 1893, taking notes payable before that date, or to settle by canceling the whole contract upon the payment of $1.75 per ton.

It is in evidence that the market price of land rock on April 1, 1892, was $4.75 per ton. The difference between this price and the contract price was therefore $2.50 per ton. After considerable discussion, a proposition was made, which Tucker concluded was advantageous to his company, and a telegram was sent, and a reply received. Copies of the same appear above. All the attendant circumstances go to show that in this telegraphic correspondence Tucker was merely the conduit through which the Caraleigh Company communicated with the Mt. Holly Company. The telegram was prepared at the instance and with the assistance of Thomas, the president of the Caraleigh Company, in his office, and a copy of it kept at his request. In effect

it was a proposition submitted by the defendant company to the plaintiff company, and not accepted in terms; but Tucker, the agent, believing that a settlement could be made, upon the basis proposed, assumed the responsibility of accepting these terms, and offered to close the matter on that day, but his offer was not accepted, and the transaction was not completed. In the same inter- view, and subsequent to the receipt of the telegram from the Berkley Phosphate Company, there was some further negotiation as to the time when the notes were to be payable, evidently with the desire to reach an agreement as to the time of payment which would accord with the instructions in the telegram to get the notes made payable within the year. The result of this negotiation was that the first note should become payable in November, 1892, instead of January, 1893, as proposed in the first telegram. When Tucker found that the transaction could not be closed on that day, and that he would have to return to Charleston without having effected a final settlement, he testifies that he informed Thomas that "if you compel me to return to Charleston, I will not take this responsibility upon myself; I will reserve the right to submit it to the principal for his action. If Mr. Chisolm agrees to the terms of this proposed compromise, the new contract and the notes will be drawn up immediately and for- warded." Upon this point Thomas testifies that "he does not recol- lect about his saying that"; "there may have been something said." Do these negotiations, propositions, understandings, or agreements of the 1st of April constitute a contract? If nothing further had been done, could the Caraleigh Company, on the next day, have enforced specific performance by bill? We think not. There was not that agreement of minds between the parties to be bound, which is of the essence of a contract. The Mt. Holly Company, through its agent, made a proposition, which was rejected. The Caraleigh Company, using the same agent as a medium of communication, made a counter proposition, which the secretary of the Mt. Holly Company, the pres- ident being absent, authorizes the acceptance of, with certain modifi- cations, which the Caraleigh Company would not assent to. The agent of the Mt. Holly Company thereupon, believing that the pres- ident would sanction his act, assumed the authority to close the negotiations upon his own responsibility,—an authority never before claimed by him, and which all the circumstances show that the Cara- leigh Company knew that he did not possess, for, if he had, there would have been no need of the submitting their offer by telegraph to his principal; but his proposition for an immediate settlement was declined, and so the matter rested. During all the time of these ne- gotiations it is claimed by the Caraleigh Company that whenever it used the word "notes" it meant non-negotiable notes, and it is claimed by the Berkeley Company that when it used the word "notes" it meant negotiable notes; so that on this point, which is of material conse- quence, the minds of the two parties to the alleged contract never came together. The letters of the Caraleigh Company of date April 7th and April 9th, and the minutes of the board of date April 12th, all negative the idea that a binding contract, specific in its terms,

was made on April 1st. The negotiations and transactions of that day had no other result than this: that the agent of the Mt. Holly Company came to an understanding with the president of the Caraleigh Company that the outstanding differences between the two companies could be settled upon certain terms. This understanding is referred to by the Mt. Holly Company in its letter of the 4th of April, inclosing the notes and new contract as an "agreement," and the same letter contains a "statement of settlement as per agreement"; but in matters of this kind courts are bound to consider the thing itself, and not the words by which it is characterized.

We are of opinion that no contract was made on the 1st of April; that the minds of the parties to be bound never came together in actual agreement as to the specific thing to be done; and therefore that the exception to the charge of the judge set forth in the thirteenth assignment of error must be sustained. The portion of the charge excepted to submitted this question to the jury. If the solution of it depended on the preponderating weight of evidence or upon the credibility of witnesses, then it was one for the consideration and determination of the jury; but it was for the judge to say whether a contract could reasonably and legitimately be inferred from the facts proved, granting to the testimony all the weight and probative force to which it was properly entitled. The onus was upon the party setting up the contract to establish it by sufficient evidence. It was not enough to prove certain facts and conversations, which had a tendency to establish it, and to leave it to the uninstructed mind of the jury to draw a conclusion that a contract was made. Conceding all the testimony to be true which relates to the transactions of April 1st, and all the inferences which legitimately may be drawn from the facts proved, they all fail to show that at any one time during that day there was such an agreement of minds as to the thing to be done that must lie at the base of every enforceable contract. If that is so, then it was error to submit it to the jury. Mr. Justice Miller in Pleasants v. Fant, 22 Wall. 116, states the duty of the court in its relations to the jury, and, reviewing the cases, says:

"And accordingly we hold the true principle to be that, if the court is satisfied that conceding all the inferences which the jury could justifiably draw from the testimony the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury."

And Judge Goff, in delivering the opinion of this court at the last term in Franklin Brass Co. v. Phœnix Assur. Co., 13 C. C. A. 124, 65 Fed. 773, cites all the authorities in support of the rule which is there stated by him:

"The decisions are many, and of the highest authority, that in cases where the testimony is of the character of that submitted to the jury in this case, it is not only proper, but the duty of the court, to direct a verdict."

This decision renders it unnecessary to consider in detail the numerous exceptions and assignments of error contained in the record, and prevents the consideration of the very interesting questions submitted in the learned and exhaustive arguments of counsel upon other aspects of the case. For the reasons given, the judgment of the court below is reversed, and a new trial ordered.